UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re WASFI A. MAKAR, M.D., P.A., | ) | |
| | ) | |
| | ) | Case No. 6:12-bk-05979-KSJ |
| Debtor. | ) | Chapter 7 |
| | ) | |
| | ) | |
| RICHARD B. WEBBER, II, Chapter 7 | ) | |
| Trustee, | ) | |
| | ) | Adversary No. 6:12-ap-00214-KSJ |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| AMERICAN CANCER TREATMENT | ) | |
| CENTERS, INC., a Florida corporation, | ) | |
| AMERICAN CANCER CONSULTANTS, | ) | |
| P.A., a Florida Corporation, and WASFI A. | ) | |
| MAKAR, M.D., an individual. | ) | |
| | ) | |
| | ) | |
| Defendant[s]. | ) | |
| | ) | |

**AMENDED MEMORANDUM
OPINION GRANTING PARTIAL SUMMARY JUDGMENT**

This case came before the Court, on May 21, 2013, upon the Motion for Summary Final Judgment by Plaintiff, Richard B. Webber, II, Chapter 7 Trustee (the "Trustee"), on behalf of Wasfi A. Makar, M.D., P.A., d/b/a American Cancer Treatment Center (the "Debtor"), (the "Motion") (Doc. No. 45) against Defendants, Wasfi A. Makar, M.D., an individual ("Makar"), American Cancer Treatment Centers, Inc., a Florida corporation ("Inc.") and American Cancer Consultants, P.A., a Florida corporation ("P.A.") (collectively, the "Defendants").

The Court, having reviewed the Motion, the Trustee's Affidavit,[1] and all exhibits, having considered the documentary evidence and argument by counsel and Makar, and otherwise being fully advised in the premises, grants partial summary judgment as to Counts I, VII, and VIII of the Plaintiff's Complaint.

## **The Parties**

1.      The Trustee is the duly appointed and acting Chapter 7 Trustee for the benefit of creditors of the estate.

2.      The Debtor is and was at all times material hereto a Florida corporation licensed to do and doing business in the State of Florida.

3.      Inc. is an active Florida corporation doing business in the Middle District of Florida.

4.      P.A. is an active Florida corporation doing business in the Middle District of Florida.

5.      Makar is a *sui juris* individual who resides in this jurisdiction.

## **Background**

6.      On May 1, 2012, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby initiating this bankruptcy case (the "Bankruptcy Case").

7.      On October 9, 2012, the Court entered an order converting the Chapter 11 Bankruptcy Case to a Chapter 7 Bankruptcy Case.

8.      On November 27, 2012, the Trustee commenced this adversary proceeding by filing an eleven count Complaint. [Adversary Proceeding ("Adv. Pro.") Doc. No. 1].

9.      On January 10, 2013, the Clerk of Court entered defaults against the Defendants. [Adv. Pro. Doc. Nos. 17-20].

---

[1] Doc. No. 45, Exhibit 1.

**Jurisdiction, Venue, Conditions Precedent and Right to Attorneys' Fees**

10.　　This Court possesses "core" jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(b) (2) (1), 28 U.S.C. § 1334, and other applicable law.

11.　　Venue properly lies before this Court pursuant to 28 U.S.C. § 1409 and other applicable law, in that this case arises in the context of the Bankruptcy Case, as defined below, and the causes of action at issue herein arose in the Middle District of Florida.

12.　　The Trustee, or the estate, has utilized the services of Gray Robinson, P.A. as special counsel starting October 10, 2012, and intends to utilize the services of special counsel for the duration of this adversary proceeding.

**The Debtor and Makar**

13.　　Makar formed the Debtor in 1997.

14.　　The Debtor's federal tax identification number ("FEIN") is 59-3127222.

15.　　At all relevant times, Makar was the sole shareholder, owner and President of the Debtor.

16.　　Makar was also the Debtor's records custodian.

17.　　Makar is a medical doctor, and the Debtor was the entity through which he conducted his medical practice.

18.　　For the purposes of medical billing, Makar reassigned to the Debtor his benefits to receive payment on account of providing medical services, which allowed the Debtor to receive payment from the insurance companies for medical services rendered by Makar.

19.　　At all relevant times, through Makar, the Debtor provided radiation treatments for cancer patients.

20.　　The Debtor conducted business under the d/b/a "American Cancer Treatment Center."

21.     The Debtor operated from two offices located at 211 Coral Sands Drive, Rockledge, FL ("Rockledge Location") and 845 Century Medical Drive, Titusville, Florida ("Titusville Location").

22.     The Debtor's mailing address and principal place of business was the Rockledge Location.

### The Debtor's Insurance Billing Practices

23.     On October 1, 2002, the Debtor executed an Agreement for Medical Billing & Practice Management (the "Agreement") with Comprehensive Medical Management, Inc. ("CMM") for CMM to bill insurance companies on behalf of the Debtor for medical services rendered to patients.

24.     In the Agreement, the Debtor identified itself as "Wasfi A. Makar, M.D. d/b/a American Cancer Treatment Center."

25.     On February 18, 2004, pursuant to the Agreement, the Debtor authorized CMM to apply for the Debtor's enrollment as a Health Care Provider for Medicare.

26.     In the Application for enrollment (the "Application"), the medical provider was identified as "Wasfi A. Makar, M.D., American Cancer Treatment Center," and the Debtor's FEIN was utilized.

27.     Makar executed the Application attesting to having read the contents of the Application and certifying that the information contained therein was true, correct and complete.

28.     In connection with the Application, CMM submitted the Articles of Incorporation of the Debtor along with the Debtor's FEIN, as evidenced by a billing statement from the Internal Revenue Service.

29.     Further, in connection with the Application, Makar applied to reassign his medical billing benefits for payment by Medicare to the Debtor  (the "Reassignment").

30.     In the Reassignment, the medical provider was identified as "Wasfi A. Makar, M.D., American Cancer Treatment Center" and the Debtor's FEIN was utilized.

31.     Makar executed the Reassignment attesting to having read the contents of the Reassignment and certifying that the information contained therein was true, correct and complete.

32.     Then, on August 16, 2006, the Debtor authorized CMM to obtain a National Provider Number ("NPI") for the Debtor, which is a unique 10-digit identification number issued to health care providers by Medicare and Medicaid Services, for billing purposes.

33.     In the Application for a NPI, the organization name was identified as "American Cancer Treatment Center" and the Debtor's FEIN was utilized.

34.     The NPI received by the Debtor from Medicare and Medicaid services was 1639287709.

### Inc. (American Cancer Treatment Centers, Inc.)

35.     Inc. was formed in 1997 by Makar.

36.     The FEIN for Inc. is 59-3446229.

37.     At all times, Makar has been the President of Inc.

38.     The mailing address and principal place of business for Inc. is the Rockledge Location.

39.     Inc. never provided any services to the Debtor or otherwise conducted any business with the Debtor.

40.     In fact, at all material times, Inc. conducted no business, and was a shell corporation without any legitimate business purpose.

### P.A. (American Cancer Consultants, P.A.)

41.     P.A. was formed in 2010 by Makar.

42.     The FEIN for P.A. is 27-3910155.

43.     At all times, Makar has been the President of P.A.

44.     The mailing address and principal place of business for P.A. is the Rockledge Location.

45.     P.A. never provided any services to the Debtor or otherwise conducted any business with the Debtor.

### The Dr. Chancellor Litigation

46.     On or about February 5, 2004, the Debtor and Michael W. Chancellor, M.D. ("Dr. Chancellor") entered into an Employment Agreement.

47.     The Employment Agreement provided for the Debtor to pay compensation, late charges, vacation pay, and reimbursement of certain expenses to Dr. Chancellor.

48.     The Debtor breached the Employment Agreement by failing or refusing to pay these amounts.

49.     On January 25, 2007, Chancellor instituted a lawsuit against the Debtor in the Circuit Court of the Eighteenth Judicial Circuit in and for Brevard County, Florida with a case captioned *Chancellor v. Wasfi A. Makar, M.D., P.A.* and with a case number of 05-2007-CA-24852 to recover amounts due for compensation, late charges, vacation pay, and reimbursement of certain expenses (the "Chancellor Litigation").

50.     On July 21, 2009, after a trial, judgment was entered in the amount of $232,244.65 against the Debtor in the Chancellor Litigation for the monetary damage caused by the Debtor's breach of the Employment Agreement.

51.     On September 30, 2009, Dr. Chancellor served a writ of garnishment on Wachovia Bank ("Wachovia") directed to any accounts held by the Debtor in an effort to satisfy the judgment.

52.     Wachovia initially froze an account held by the Debtor, but shortly thereafter, mistakenly asserted that the account frozen was not held by the Debtor.

53.     As a result, Dr. Chancellor agreed to relieve Wachovia of the obligation to garnish the account.

54.     On November 13, 2009, Wachovia released control of the Debtor's account.

55.     On that same date, the Debtor issued check number 13596 in the amount of $100,000.00 on the frozen account held at Wachovia and issued the check to Inc., which then was deposited into an account held at RBC Bank ("RBC").

56.     Upon discovering this information, Dr. Chancellor investigated farther into the Debtor's operations and finances.

57.     On December 13, 2011, an amended judgment was entered in the amount of $318,563.61 against the Debtor in the Chancellor Litigation, representing the attorneys' fees and costs incurred by Dr. Chancellor in the Chancellor Litigation.

## The Bank Accounts and the Transfers

58.     Despite the fact that all practice revenues were earned by the Debtor and billed under the Debtor's NPI and FEIN, since January 1, 2007, and even earlier, through March 2010, virtually all practice revenues were diverted to an account at RBC held by Inc. and Makar with an RBC account number ending in 2879 ("RBC Account 1").

59.     After diverting the Debtor's revenues into RBC Account 1, Makar then transferred a portion of those funds to a second account at RBC held by Makar and Inc. with a RBC account number ending in 7122 ("RBC Account 2"), and then transferred a portion of the funds to an account at Wachovia held by the Debtor with an account number ending in 1580 ("Wachovia Account").

60.     RBC Account 1 and RBC Account 2 have never been funded by anything other than revenues generated by the Debtor, although the owner of the these accounts - Inc. - never provided medical services to anyone, or conducted any business of any kind.

61.    From each of these accounts, Makar further diverted the funds by transferring substantially all, if not all, of the money out of these accounts for his own benefit.

62.    For instance, from January 2007 through January 2008, RBC Account 2 was funded solely by transfers made from RBC Account 1, which was funded solely by insurance payments made to the Debtor on account of its medical services rendered and deposited into RBC Account 1.

63.    In January 2008, by virtue of the transfers, the RBC Account 2 held approximately $1,000,000.

64.    On January 29, 2008, Makar effectuated a $750,000 transfer from RBC Account 2 to JPMorgan Chase Bank to invest in a Penson Financial Services account ("Penson").

65.    Then, on October 15, 2008, Makar effectuated a $400,000 transfer and on November 4, 2008, a $200,000 transfer to JPMorgan Chase Bank to invest in a Penson Financial Services account.

66.    This was accomplished at a time when the Debtor owed debts that the Debtor was unable to satisfy.

**Makar Used the Debtor's Funds to Pay Personal Expenses**

67.    Exhibits 1 and 2 to the Webber Affidavit contain payments all of which were made for the benefit of Makar from the Debtor's diverted practice revenues.

68.    For instance, according to the Schedule A of the Debtor's Voluntary Petition, the Debtor owns no real property.  However, on Exhibits 1 and 2 there are transfers which relate to the purchase, construction, leasing and maintenance of real property.  These transfers include payments made to Spyglass Realty, Kensington South Condominium, BPRH, Construction Engineering Group, Richard's Floor Design, Von Frose, Tax Collector (Gainesville, Texas), Viera East Association, Tuttle-Armfield-Wagner, Re/Max Service Team.  These transfers were not for legitimate business expenses as the Debtor did not own any real property.

69.    Also, Makar wrote checks to his mother, Odette Makar, and his wife, Vivian Makar, which were not for legitimate business expenses, as they were not employees of the Debtor or otherwise rendered services for the Debtor entitling them to payment.

70.    Vivian Makar signed the following checks using the Debtor's bank account: Palm Café, Timmy Vee, Edward Butchezine, Dave Pontones, Daisen Japanese Restaurant, Terry Bury, Crown Plaza, Joan Berni, Lillian Fares, Paul S. Inc., Cash, Sand Kong, Douglass.    These payments were not for legitimate business expenses as Vivian Makar had no authority to use the Debtor's practice revenues.

71.    The Debtor issued checks to Casino Express of Central Florida, Beau Rivage and M.D.D.C., which are all casinos.    There was no legitimate business reason for these transfers. Makar testified that he used the Debtor's funds to cover expenses for casino trips, including $80,000 for a family reunion.

72.    The Debtor issued checks to Arch Angel Michael Church, a Florida non-profit organization for which Vivian Makar is a director.    There was no legitimate business reason for these transfers.

73.    The Debtor issued checks to Norwegian Cruise Line.    There was no legitimate business reason for these transfers.

74.    The Debtor regularly issued checks to Florida Medical Physics & Engineering Consulting, Inc., which is owned by Simon Makar who is a relative of Makar.    The frequency of these checks is not consistent with a legitimate business practice of maintaining medical equipment.

75.    Additionally, Makar used the funds to cover expenses for his daughter's wedding.

76.    All transfers of funds identified herein, and on Exhibits "1" and "2" to the Trustee's Affidavit will be referred to herein as the "Bank Transfers."

**Insolvency of the Debtor**

77.    The Bank Transfers as well as the medical equipment and corresponding office supplies constitute all of the Debtor's assets.

78.    At no time did the Debtor have any capital because Makar diverted all of the Debtor's funds ultimately for his benefit.

79.    The Bank Transfers were all made at a time when the Debtor owed Dr. Chancellor substantial sums.

80.    The Debtor knew at the time the Debtor breached the Employment Agreement with Dr. Chancellor that the Debtor would be responsible for repaying Dr. Chancellor.

81.    Most, if not all, of the Bank Transfers occurred after the Debtor breached the Employment Agreement.

82.    The Debtor knew or should have known that the Debtor would have substantial liability to Dr. Chancellor in light of the amounts the Debtor and Makar failed and refused to pay.

83.    After the Bank Transfers, the Debtor was unable to pay Dr. Chancellor when the debt became due.

**The Debtor concealed the Transfers**

84.    The Debtor and Makar did everything possible to conceal the Bank Transfers.

85.    First, during discovery in aid of execution in the Chancellor Litigation, the Debtor refused to respond to questions related to its assets and raised the Fifth Amendment privilege against self-incrimination.

86.    Second, in September, 2009, when the Debtor mistakenly received the garnished funds back from Wachovia, the Debtor immediately transferred those funds to the accounts at RBC and ceased using the Wachovia Account.

87.     Third, when Dr. Chancellor learned of the accounts at RBC, the Debtor quickly withdrew all funds from those accounts and proceeded to open an account at TD and diverted all of the Debtor's revenues to the account at TD.

88.     Fourth, on May 1, 2012, when the Debtor instituted its Chapter 11, the Debtor did not identify the accounts at RBC or the account at TD despite the fact that all of the Debtor's funds were diverted to these accounts.

89.     Finally, in the Bankruptcy Case, initially, the Debtor represented that all remaining assets were transferred to P.A., but then later represented that all remaining assets were transferred to Inc.

## Motion for Summary Judgment

90.     The Plaintiff filed a Motion for Summary Judgment on February 25, 2013, arguing no facts are in dispute and the Plaintiff is entitled to judgment as a matter of law.

91.     The Defendant made three arguments in opposition to the Plaintiff's motion, arguing (1) Court lacks constitutional authority to adjudicate any of the claims under *Stern v. Marshall*, 131, S.Ct. 2594 (2011), (2) the Plaintiff's affidavit in support of the Motion is insufficient because he lacks personal knowledge, and (3) an issue of material fact exists as to the Defendant's actual intent, which precludes summary judgment.[2]

Under Federal Rule of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy Procedure 7056, a court may grant summary judgment where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." The moving party has the burden of establishing the right to summary judgment. "When a motion for summary judgment has been made properly, the nonmoving party may not rely solely on the pleadings, but . . . must show that there are specific facts demonstrating that there is a

---

[2] Doc. No. 67.

genuine issue for trial."[3]   Conclusory allegations by either party, without specific supporting facts, have no probative value.[4]   In determining entitlement to summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.[5]   "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."[6]

### (Count I:  Intentionally Fraudulent Transfer)

92.    Under 11 U.S.C. §§ 548, 550, 551, and Florida Statues §§ 726.105(1)(a), 726.108(1)(a) and (2), and 726.109(2) and (3), the Trustee may recover transfers of a debtor's interest in property made within 2 and 4 years before filing a bankruptcy petition and with the intent to hinder, delay, or defraud creditors of the Debtor.  A bankruptcy court has jurisdiction to hear these claims.[7]

93.    The Court finds Makar and Inc. are liable for their receipt of the Bank Transfers as the Bank Transfers were made with the actual intent to hinder, delay and defraud the Debtor's creditors, based on the following:

   a.  The Debtor has not disputed any of the facts alleged as to the Plaintiff's allegation that the Bank Transfers were made fraudulently with the intent to hinder, delay and defraud creditors.

   b.  The Bank Transfers were made to an insider.

---

[3] *Brown v. Crawford,* 906 F.2d 667, 670 (11th Cir. 1990).
[4] *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).
[5] Fed. R. Civ. P. 56(c).
[6] *United States v. Robinson,* 78 F.3d 172, 174 (5th Cir.1996).
[7] *In re Canopy Fin., Inc.*, 464 B.R. 770, 775 (N.D. Ill. 2011). Should the District Court determine the Court does not have authority to enter final judgment, it may treat this Memorandum Opinion and Judgment as proposed findings of fact and conclusions of law.  *Id.* See also 6:12-MC-26-ORL-22 Amended Order of Reference.

c.  At all material times, Makar was the sole shareholder and director of the Debtor, and although Inc. did not have any ownership or management interest in the Debtor, for all purposes, Makar was Inc. and Inc. was Makar.

d.  The Bank Transfers should have been disclosed.  Makar concealed them whenever possible.

e.  Makar frequently changed financial institutions to avoid creditor actions and refused to answer legitimate collection questions.

f.  The Bank Transfers were made at a time when the Debtor was engaged in litigation with Dr. Chancellor, which resulted in a large judgment in favor of Dr. Chancellor and against the Debtor.

g.  The Bank Transfers were nearly all of the assets of the Debtor, and the Debtor became insolvent by virtue of the Bank Transfers.

h.  The Bank Transfers drained the Debtor of virtually all its revenues.

i.  The Debtor did not receive anything of value from Inc. for the Bank Transfers, and any value Makar provided was disproportionate compared to the amount of the Bank Transfers.

j.  The evidence offered throughout this case, especially including the evidence offered on January 15, 2013, illustrates many badges of fraud to prove the Debtor's intent to hinder, delay and defraud its creditors.

k.  The Trustee's affidavits in support of his motion are sufficient.

l.  The Defendant had an ample opportunity to review the evidence and affidavits and has not refuted any of the facts presented.

94.    The Court specifically finds that the January 29, 2008, $750,000 transfer from RBC Account 2 to JPMorgan Chase Bank for Makar's investment in a Penson Financial Services account is fraudulent and subject to turnover.

95.     The total sum of the fraudulent transfers likely exceeds $8,000,000. The Court need not determine the entire amount of the avoidable transfers because the Trustee's recovery is limited to the amount needed to pay all claims and costs in the case. At this point, claims of $1,795,391.44 are filed in this case. The exact amount has not yet been determined.  The total claims against the estate shall be determined at a later date and the Court will extend the bar date to November 29, 2013, for creditors, perhaps not scheduled by the Debtor, to file additional proofs of claim.

96.     The Plaintiff will be entitled to recover from the Defendants, WASFI A. MAKAR, M.D., 143 Lansing Island Drive, Indian Harbour Beach, FL 32937, AMERICAN CANCER TREATMENT CENTERS, INC. (Federal Tax I.D. Number 59-3446229), and Apex Clearing Corporation (successor to Penson) as property of the estate, an amount not exceeding the total amount of claims against the estate plus the trustee's costs of administering the estate, including attorneys' fees and costs incurred in his recovery action.

97.     If any funds are left in the estate after all creditors and interested parties' claims are paid, the Trustee will be required to disgorge to the Debtor any property remaining.[8]

## Count VII:  Mere Continuation/Successor Liability

98.     Inc. and P.A. are deemed the mere continuation of the Debtor for all legal purposes, and are liable for the debts of the Debtor, based on the following:

   a.   Makar is the sole shareholder and owner of Inc. and P.A.

   b.   Makar transferred all assets of the Debtor to Inc. and P.A. when the Debtor ceased operations.

   c.   Inc. and P.A. both operate from the Rockledge Location and the Titusville Location, and operate the identical business involving the same patients.

---

[8] 11 U.S.C. § 726(a)(6).  *In re Air Safety Int'l, L.C.,* 336 B.R. 843 (S.D. Fla. 2005) (holding a Chapter 7 debtor is capable of receiving distribution of surplus, notwithstanding its administrative dissolution).

> d.  One day the Debtor ceased operations, but the very same day, Inc. and P.A. began their operations.

99.    WASFI A. MAKAR, M.D., 143 Lansing Island Drive, Indian Harbour Beach, FL 32937, AMERICAN CANCER TREATMENT CENTERS, INC. (Federal Tax I.D. Number 59-3446229), 211 Coral Sands Drive, Rockledge, FL 32955, and AMERICAN CANCER CONSULTANTS, P.A. (Federal Tax I.D. Number 27-3910155), 211 Coral Sands Drive, Rockledge, FL 32955, are hereby liable for all of the debts of the Debtor.

### Count VIII:  Alter Ego/Corporate Veil Piercing

100.    To pierce the corporate veil under Florida law, the claimant must establish by a preponderance of the evidence that: "(1) the shareholder dominated and controlled the corporation to such an extent that the corporation independent existence, was in fact non-existent and the shareholder shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant."[9]

101.    The corporate veils of the Debtor, Inc. and P.A. are hereby pierced for all legal purposes, based on the following:

> a.  Makar formed and operated the Debtor as a buffer with the intent to separate its assets from Makar, Inc., P.A.
>
> b.  Inc. and P.A. have no corporate existence or purpose that is legitimate or lawful and Makar and the Debtor are one in the same.
>
> c.  Makar formed Inc. and P.A. solely as a mechanism for the Debtor to transfer a significant portion of its assets as a going concern and thus unfairly prejudiced the

---

[9] *In re Hillsborough Holdings Corp.,* 166 B.R. 461, 468-69 (Bankr. M.D. Fla. 1994) *aff'd*, 176 B.R. 223 (M.D. Fla. 1994) (citations omitted).

creditors of the Debtor by placing these valuable assets outside of the reach of the creditors at the time of the Debtor's insolvency.

102.   A separate Order and Final Judgment consistent with this Memorandum Opinion shall be entered.

DONE AND ORDERED *nunc pro tunc* to June 25, 2013, this 15th day of August, 2013.

_____
KAREN S. JENNEMANN
CHIEF UNITED STATES BANKRUPTCY JUDGE